AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Southern District of West Virginia

**SEALED**

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Family Discount Pharmacy
Old Route 119, Mount Gay, Logan County, West Virginia

)
)
)
)
)
)

Case No.  2:18-mj-00073

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Southern_____ District of _____West Virginia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

**FILED**

JUL 1 7 2018

RORY L. PERRY II, CLERK
U.S. District Court
Southern District of West Virginia

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846 | Conspiracy to distribute Schedule II Controlled Substances |

The application is based on these facts:

See attached Afffidavit.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Joshua T. Tripp, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___July 16, 2018___

_____
*Judge's signature*

Dwane L. Tinsley, United States Magistrate Judge
*Printed name and title*

City and state: _____

**ATTACHMENT A**



Family Discount Pharmacy in Mt. Gay, Logan County, West Virginia, is identified by two separate numbered locations, 1247 Old Route 119 in Mt. Gay, West Virginia, and 360 Mount Gay Road, Mt. Gay, West Virginia.  The building is located at the intersection of Holden Road and Mud Fork Road. Family Discount Pharmacy's main entrance faces west and is bordered to the north by railroad tracks.  Family Discount Pharmacy shares a building with a U.S. Post Office (Addressed as 352 Mt Gay Road, Mt. Gay, West Virginia, 25637).  Family Discount Pharmacy and the U.S. Post Office have separate entrances.  Family Discount Pharmacy is within a brick masonry and metal structured building with large glass windows on the front of the building.  The western half of the building is one story, while the eastern half of the building is two story.  A sign on the front of the building reads "Family Discount Pharmacy" and is red and white.

## ATTACHMENT B
## ITEMS TO BE SEIZED

Property and records that constitute evidence of the commission of criminal offenses,

specifically violations of 21 U.S.C. § § 841(a)(1), 843, and 846, and property designed or

intended for use or which is or has been used as a means of committing said criminal offenses.

Including the following:

1. All controlled substance prescriptions from November 18, 2013 through present;

2. Daily drug logs, records, notes, memoranda, payment information, customer/patient charts and information files regarding prescriptions for controlled substances filled from November 18, 2013 through present, including but not limited to, information regarding the customers to whom the controlled substances are prescribed and the customers retrieving the prescriptions;

3. Records pertaining to Family Discount Pharmacy's ordering of both controlled and non-controlled substances, invoices related to each purchase, orders that were denied, cancelled, or refused, any communication documenting the reason for any denial or refusal, and any communication between Family Discount Pharmacy, its agents or employees, discussing an order from a controlled substance supplier;

4. Communications (electronic, written, or summaries of verbal conversation) between owners, managers, employees, practitioners, customers, and/or drug suppliers, which constitute evidence of violations of the Controlled Substance Act;

5. Any and all records regarding ownership or incorporation of Family Discount Pharmacy;

6. Any financial documents associated with Family Discount Pharmacy, including but not limited to, checkbooks, bank statements, checks and deposit items for the period of November 18, 2013 through present, that may reveal the location of proceeds or profits from the illegal distribution of controlled substances; and

7. Any surveillance media which may contain footage relating to the illegal distribution of controlled substances.

**A F F I D A V I T**

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, to-wit:

I, Joshua T. Tripp, being first duly sworn, do hereby depose and state as follows:

1.      I am a Special Agent of the Department of Justice, Drug Enforcement Administration (DEA).  As such, I am "an investigative or law enforcement officer of the United States," as defined within Section 2510(7) of Title 18, United States Code (USC), and empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21 of the United States Code. I have been employed as a Special Agent with DEA since August 2016.  I am currently assigned to the Charleston District Office (CDO), Charleston, West Virginia, Tactical Diversion Squad (TDS), investigating narcotics trafficking, money laundering, and the diversion of licit pharmaceutical controlled substances and listed chemicals.

2.      I received approximately twenty-four (24) weeks of specialized training in Quantico, Virginia, pertaining to narcotics trafficking, money laundering, undercover operations, and electronic and physical surveillance procedures.  I also attended an additional twelve (12) weeks of specialized training as a DEA Diversion Investigator (DI), receiving instruction on investigative techniques on the diversion of pharmaceutical controlled substances and listed chemicals.

3.      Prior to being a DEA Special Agent, I was a sworn law enforcement officer in the state of North Carolina since 2006.  In that capacity, I investigated many violations of North Carolina State Laws, including the North Carolina Controlled Substances Act.  I was also a DEA Diversion Investigator from May 2012 to September 2013.

4.      In narcotics and narcotics money laundering investigations, I have been trained in a variety of investigative techniques and resources, including physical and electronic surveillance, the

1

analysis of telephone records, and the use of various types of informants and cooperating sources.  I have assisted and conducted undercover operations and I have executed various arrest and search warrants.  I have debriefed informants.  Through these investigations, my training and experience, and my conversations with other law enforcement investigators, I have become familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds related to the sales of narcotics.  I am familiar with the methods employed by large-scale narcotics organizations in attempts to thwart detection by law enforcement, including, but not limited to, the use of cellular telephone technology, counter-surveillance techniques, elaborately planned smuggling schemes tied to legitimate businesses, false or fictitious identities, and coded communications and conversations.

5.     This Affidavit is based on information from my personal investigation as well as information provided to me by other law enforcement officers.  Because this Affidavit is made for the limited purpose of securing authorization for a search warrant, it does not include every fact known to me concerning this investigation; rather it sets forth only the facts which I believe are necessary to establish probable cause to issue the search warrant as requested.

## BACKGROUND

6.     For the purpose of this Affidavit, the term practitioner refers to any medical professional who is licensed to practice medicine in the state where they practice and who is authorized, through a registration with the DEA, to prescribe a controlled substance.

7.     Title 21, U.S.C. Section 802 defines a controlled substance as a drug or other substance, or immediate precursor, included in Schedule I, II, III, IV, or V. The DEA has been directed by Congress to designate controlled substances based on their medical uses, addictive qualities and potential for abuse and to place them into Schedules I through V. Not all drugs have

addictive qualities or present the potential for abuse and therefore not all drugs are controlled substances.

8.      Title 21, U.S.C. Section 823 requires the Attorney General of the United States to register manufacturers, distributors, and dispensers of controlled substances to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, research, or industrial channels. In the law enforcement community the term "diversion" commonly refers to the various situations in which a controlled substance ends up outside the legal channels previously described.

9.      Although some of these controlled substances are diverted by theft, the overwhelming majority are diverted through illegal acts on the part of practitioners or the person to whom the controlled substances are prescribed, or a combination of the two. In recent years, the rise in the availability of oxycodone (a Schedule II controlled substance), hydrocodone (a Schedule II controlled substance[1]), and other controlled substances to persons in West Virginia and eastern Kentucky has given rise to an enormous regional diversion problem. This phenomenon has become known in the media and other outlets as the "pill pipeline."

10.     In the case of large-scale diversion, unethical and illegal acts on the part of practitioners are essential. These practitioners usually operate from behind the veil of a medical practice, frequently referred to as "pain clinics," whose purpose purports to be the treatment of chronic pain. Pain clinics often offer only narcotic therapy, usually oxycodone in varying short release formulations. Pain clinics often issue additional prescriptions for benzodiazepines (e.g., Xanax or Valium, which are Schedule IV controlled substances), gabapentin (a non-controlled substance federally, but designated a "drug of concern" by the West Virginia Board of Pharmacy

---

[1] Prior to October 2014, hydrocodone was a Schedule III controlled substance.

3

and a Schedule V controlled substance in Kentucky), carisoprodol (a non-controlled substance and muscle relaxer marketed under the brand name "Soma"), and other non-controlled medications such as ibuprofen. These combinations are often recognized by law enforcement as a pain clinic "cocktail," and are considered indicative of illegitimate prescribing.  Drug abusers have reported that taking a benzodiazepine and/or gabapentin with an opioid (such as oxycodone) will intensify the narcotic high of the opioid.  As such, these combinations of drugs are desirable to individuals engaged in diversion.

11.    The operation of a pain clinic for the purpose of diverting pharmaceuticals, and ultimately for the profit of the owners, requires the practitioners to ignore certain indicators of potential diversion ("red flags") in their clientele that competent and responsible practitioners routinely recognize.  I have learned through past investigations and interviews of doctors operating both legitimate and illegitimate practices that these "red flags" include, but are not limited to, the following:

- Patients who travel long distances or across state lines to visit a particular practitioner;

- Groups of patients traveling together to visit the particular practitioner;

- A single person (patient or otherwise) paying for numerous patients to see the doctor;

- Patients who possess identification from the state in which the practitioner is located, but who obviously reside elsewhere;

- Parking lots full at the daily opening of the practitioner's clinic; and

- Pharmacies refusing to fill prescriptions from the practitioner.

12.    I am also aware that multiple federal courts have recognized certain recurring

4

behaviors of practitioners as indicative of diversion:

- Inordinately large numbers of controlled substances were prescribed;

- Large numbers of prescriptions were issued;

- Lack of, or only a cursory exam;

- Little, if any, non-pharmacological methods of pain treatment;

- Physician warned the patient to fill prescriptions at different drug stores;

- Physicians issued prescriptions to a patient known to be delivering the drugs to others;

- Many patients prescribed the same combination of drugs;

- Prescribed controlled drugs at intervals inconsistent with legitimate medical treatment; and

- No logical relationship between the drugs prescribed and treatment of the condition already existing.

13.     Unethical and illegal acts on the part of pharmacists are also an essential part of any large-scale diversion system. As much as a practitioner must be willing to ignore his/her legal responsibility in issuing a prescription, a pharmacist must also be willing to ignore his/her corresponding responsibility to insure the prescription is for a legitimate medical purpose and then fill the prescription.

14.     Title 21, C.F.R. Section 1306.04 requires a prescription for a controlled substance to be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The regulation provides that "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order

purporting to be a prescription issued not in the usual course of professional treatment…is not a prescription within the meaning and intent of [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." 21 C.F.R § 1306.04(a).

15.     To further provide guidance to pharmacists, the DEA publishes the "Pharmacist's Manual," a document that further defines the legal requirements for the dispensing of a controlled substance. This document addresses the pharmacist's corresponding responsibility in the following manner: "An order purporting to be a prescription issued not in the usual course of professional treatment . . . is an invalid prescription within the meaning and intent of the CSA (21 U.S.C. § 829). The person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." The manual goes on to explain that "[a] pharmacist is required to exercise sound professional judgment when making a determination about the legitimacy of a controlled substance prescription. Such a determination is made before the prescription is dispensed. The law does not require a pharmacist to dispense a prescription of doubtful, questionable, or suspicious origin. To the contrary, the pharmacist who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be prosecuted along with the issuing practitioner, for knowingly and intentionally distributing controlled substances. Such action is a felony offense, which may result in the loss of one's business or professional license."

16.     Appendix D of the Pharmacist's Manual is titled "Pharmacist's Guide to Prescription Fraud." Under the subheading, "Types of Fraudulent Prescriptions," are criteria that

may indicate that a prescription was not issued for a legitimate medical purpose, including:

- The prescriber writes significantly more prescriptions (or in larger quantities) compared to other practitioners in the area.

- A number of people who appear simultaneously, or within a short time, all bearing prescriptions from the same physician.

- People who are not regular patrons or residents of the community show up with prescriptions from the same physician.

17.    In an attempt to determine the knowledge base among the professional pharmacy community, I and other law enforcement agents have compiled information from pharmacists interviewed by DEA and experts in the field of pharmacy. These interviews made it obvious that pharmacists, as a professional community, are well aware of the problem of diversion and the methods used by drug users and dealers to obtain controlled substances. The following non-exhaustive list represents some of what are commonly known in the pharmacy community as "red flags" or obvious indicators of illegitimate prescriptions and illegal diversion:

- Patients suspected to be indigent presenting large quantities of cash to fill prescriptions for controlled substances;

- Patients in the pharmacy visibly under the influence of narcotics, appear to be destitute or unemployed, and seem to lack physical symptoms of pain;

- The dispensing of the same types of controlled substances, strengths, and quantities to multiple individuals – often on the same day – without regard to individual characteristics, allergies, contraindications, or concomitant medications;

- The dispensing of combinations of drugs that intensify or prolong the narcotic effects of the drugs being dispensed and used;

- The dispensing of opioids and other contraindicated drugs to individuals who were prescribed Suboxone, a drug used in the course of substance abuse treatment;

- The dispensing of controlled substances to multiple individuals presenting prescriptions for controlled substances, especially from outside the state and long distances away from the dispensing pharmacy, without any documented relationship with the prescriber or pharmacist;

- Patients immediately meeting with other individuals outside the pharmacy after having a controlled-substance prescription filled, and exchanges made between the subject who filled the prescription and those he/she met; and

- Multiple individuals, sometimes related or cohabitating, who travel to a pharmacy together presenting similar prescriptions in similar dosage and quantity.

18.     Pharmacists charged with drug-trafficking felonies in various federal courts have been convicted on the grounds that they ignored their corresponding responsibility, which led to the diversion and distribution of controlled substances. The Fourth Circuit has held that "[t]he question, then, in any case where a pharmacist is charged with illegal distribution of controlled substances, is whether he knew that the purported prescription was not issued for a legitimate medical purpose or in the usual course of medical practice." *United States v. Lawson*, 682 F.2d 480, 482 (4th Cir. 1982) (citing *United States v. Hayes*, 595 F.2d 258, 261 (5th Cir. 1979)). The Fourth Circuit went on to explain, "[t]he key element of knowledge may be shown by proof that the defendant deliberately closed his eyes to the true nature of the prescription." *Id.* (citing *United States v. Seelig*, 622 F.2d 207, 213 (6th Cir. 1980).

19.     Based on my training and experience, I am aware that DEA registrants, including pharmacists, are required to maintain records relating to the dispensing of medications. Section 5-

8

4-4 of the West Virginia Rules of the Board of Pharmacy requires the following: "[r]ecords of dispensing of prescription drugs for original and refill prescriptions are to be made and kept by pharmacies for five (5) years." The rule goes on to require that prescriptions filled within the previous year must be immediately accessible and sets a time of not more than 48 hours to produce records older than one year and up to five years old. Along with records of the original and refill prescriptions, I am aware that pharmacists often maintain electronic records, notes, ledgers, banking information, daily signature logs of those who received prescriptions, electronic signature logs, and various other physical and electronic records, to include e-mail and electronic communications, pertaining to the dispensing of medications and controlled substances.

20.     I am also aware, based on involvement in prior investigations involving registrants, to include pharmacists, that pharmacists involved in the diversion and illegal distribution of controlled substances often do so for financial benefit. In doing so, pharmacists will often ignore financial indicators of a lower income patient, who suddenly have access to large amounts of cash to fill prescriptions for controlled substances. One such financial indicator is enrollment in Medicaid. In my experience, pharmacists who bill Medicaid for a patient are generally aware of limited financial means available to persons covered under the Medicaid program.

21.     In my experience, pharmacists who accept third-party payers (e.g., private insurance and Medicaid) to fill a prescription for a non-controlled substance while charging cash for a controlled-substance prescription filled at the same time will do so at an increased price for the controlled substance. Pharmacists are generally aware of the addictive potential of controlled substances, especially opioids like hydrocodone and oxycodone, the diversion of these controlled substances, and that the persons involved in this diversion will pay increased cash prices to have controlled-substance prescriptions filled.

9

22.     The West Virginia Board of Pharmacy (WVBOP) maintains records of Schedule II, III, and IV controlled substances dispensed in West Virginia. Within 24 hours of dispensing a prescription for these controlled substances, pharmacists are required by law to enter information regarding the recipient of the substance, the practitioner who wrote the prescription for the substance, and the type, amount, and quantity of the substance dispensed, and the payment method. W. Va. Code R. § 15-8-1, *et seq*. Registrants can access this database via a website, and I am aware that it is common for pharmacies to maintain computers on the premises to access the WVBOP.

23.     Family Discount Pharmacy of Mt. Gay (hereinafter "Family Discount Pharmacy" or "the pharmacy") is located on Old Route 119 in Mount Gay, West Virginia, 25637, and is more fully described in Attachment A. The Pharmacist in Charge (PIC) at Family Discount Pharmacy is Earl Ray Claycomb. According to the West Virginia Secretary of State, Claycomb is currently the President of Family Discount Pharmacy.  According to the DEA's registration database, Claycomb has been the primary point of contact since August 8, 2008. Family Discount Pharmacy holds DEA registration #BF0660565, which allows Family Discount Pharmacy to dispense controlled substances in Schedules II through V as long as the dispensing is done pursuant to a prescription issued by a physician acting for a legitimate medical purpose in the usual course of his or her professional medical practice and within the bounds of medical practice.

**PROBABLE CAUSE**

24.     In January 2013, the DEA Charleston, West Virginia District Office (CDO) Diversion Group conducted a database record check in reference to pharmacies in West Virginia ordering large amounts of controlled substances. This database check identified Family Discount Pharmacy as the pharmacy with the largest orders of hydrocodone in the State of West Virginia.

25.     On January 4, 2013, DEA CDO personnel, familiar with the rural area and very low

population in and around Mt. Gay, traveled to Family Discount Pharmacy to identify if there was a legitimate reason for the large orders of hydrocodone. DEA personnel arrived at Family Discount Pharmacy and made contact with Family Discount Pharmacy owner, Earl Claycomb. DEA personnel presented their credentials and a DEA Form 82, Notice of Inspection of Controlled Premises (NOI), to Claycomb. Claycomb was advised of his right not to have an administrative inspection made without an administrative inspection warrant under Title 21 C.F.R. section 1316.08. I, SA Tripp, was at the time assigned as a Diversion Investigator (DI), and I read Claycomb the Statement of Rights and then had Claycomb read the Statement of Rights. Claycomb consented to the inspection. Claycomb acknowledged that he understood the Statement of Rights and signed the NOI. Claycomb was provided with a copy of the NOI for his records.

26. During the inspection, DEA personnel conducted a review of Schedule II and Schedule III controlled substance prescriptions. During the review of Schedule II prescriptions, DEA personnel noted multiple prescriptions that came from the same doctors for multiple patients in which the same drug and/or drug combinations and strengths were prescribed. The prescribing did not appear to be individualized to each patient, but rather the same for each patient. They also noted that multiple occasions in which patients had traveled for hours, out of their way, to doctors in areas such as Cleveland and Columbus, Ohio; Huntington and Charleston, West Virginia; and Nashville, Tennessee, and then had their prescriptions from such doctors filled at Family Discount Pharmacy. DEA personnel noted similar prescribing patterns when they reviewed the Schedule III controlled substance prescriptions, and that there was high amount of Schedule III through V prescriptions (at the time, hydrocodone was a Schedule III controlled substance).

27. During the inspection, DEA personnel interviewed Claycomb. Claycomb was

asked about prescriptions he accepted and dispensed from doctors who prescribed many of the same drugs, drug strengths, and drug combinations to various patients. Claycomb admitted that he did not perform his due diligence or fulfill his corresponding responsibility as a pharmacist in regards to filling prescriptions. Claycomb further stated that in his professional opinion, he did not feel as though many of the prescriptions were legitimate. However, Claycomb did not call and verify the legitimacy of the prescriptions he filled. Additionally, Claycomb was asked about the many prescriptions he filled for patients who were from out of state or who had doctors from out of state. Claycomb again stated that he did not fulfill his corresponding liability as a pharmacist to ensure that the prescriptions were valid. Claycomb agreed that it was not normal for a person from out of state, or who had a doctor out of state, to drive past several pharmacies near their home or where the doctor's office was, to go to Family Discount Pharmacy and have the prescriptions filled. Claycomb said many pharmacies will not fill prescriptions by certain doctors at local pain clinics because of suspicious prescribing habits. Claycomb also attributed the increase in his hydrocodone dispensing to Family Discount Pharmacy being the only pharmacy that would fill the prescriptions. Claycomb also agreed that this form of activity is very similar to those who are either doctor shopping or pharmacy shopping. Claycomb said that in the future he would be more diligent with regard to filling suspicious prescriptions.

28.     On November 4, 2013, this Court issued an Administrative Inspection Warrant (AIW) for inspection for the registered premises of Family Discount Pharmacy. On November 18, 2013, DEA personnel served the AIW at Family Discount Pharmacy, and provided Claycomb a copy.   During the inspection, many members of the Family Discount Pharmacy staff were interviewed. The following are summaries of the relevant information from those interviews:

a. Angela Claycomb: Ms. Claycomb was a pharmacy technician and part owner of the pharmacy for the previous 13 years; she was aware that a large number of hydrocodone prescriptions were filled at the pharmacy; she had suspicions about prescriptions issued by Dr. Delano Webb, the doctors working in the Hope Clinic, and Dr. Iyer (known to be Dr. Shivkumar Laksminaryan Iyer); and that at least half of the prescriptions she filled were paid for in cash as opposed to third-party/insurance.

b. Kimberly Horn: Ms. Horn had worked as a pharmacy technician at Family Discount Pharmacy for approximately four years; she noticed suspicious prescription patterns from Dr. Delano Webb and Dr. Shivkumar Laksminaryan Iyer; the pharmacy would fill prescriptions written by Dr. Delano Webb which specified 440 Oxycodone 80 mg pills per month to one patient alone; she was concerned after seeing customers dealing pills in the pharmacy parking lot, coming in noticeably intoxicated on pills and many customers who were paying for their prescriptions in cash; and that some customers would come in and ask for specific drugs by brand name, colors, or imprinted number/logo.

c. Rhonda Craddock: Ms. Craddock was employed at Family Discount Pharmacy as a pharmacy technician and manager; she had suspicions about prescriptions issued by doctors from the Hope Clinic; at least half of the prescriptions she filled were paid for in cash as opposed to third-party/insurance; and that the "fastest moving" controlled substances by Schedule were: Oxycodone 15 mg pills ( Schedule II), Hydrocodone 7.5/10 mg pills (Schedule II, formerly Schedule III), and Suboxone (Schedule III), and Xanax 1 mg pills (Schedule IV).

d. Jessica Adams: Ms. Adams was a pharmacy technician; Dr. Webb has questionable prescribing practices due to prescribing a lot of pain medication, specifically one time for 360 "Roxi's" (slang term for a brand of oxycodone); she was suspicious of the Hope Clinic; the Hope Clinic wrote a lot of oxycodone and "Roxi" prescriptions; patients sometimes pay for one prescription with insurance and another prescription with cash; Dr. Webb prescribes Opana (oxymorphone) and Percocet (oxycodone); people specifically ask for Watson brand; that some have used slang terms in the past (green beans, pink ones, blue ones), and asked for the football shaped Xanax; that Dr. Manuel and Dr. Agas write lots of cocktail prescriptions, and that the Hope Clinic and Dr. Webb write prescriptions for multiple types of opioids.

29.     In sum, during the aforementioned interviews with Family Discount Pharmacy staff, references were made to doctors with suspicious prescribing patterns, questionable prescribing habits, a high volume of patients paying cash, patients sometimes paying for one prescription with insurance and another prescription with cash, high volume prescriptions for

13

controlled substances, customers dealing pills in the pharmacy parking lot and coming in noticeably intoxicated, asking for specific drugs by brand name, colors, or imprinted number/logo or using street slang pills.

30.     A review of information obtained from WVBOP corroborated information provided by the staff of Family Discount Pharmacy. Specifically, the WVBOP data show dates where individuals have used private pay (i.e., paying out-of-pocket) and third-party payers (Medicaid/insurance) to pay for controlled substances on the same date, a known red flag for pharmacists, and a practice that the pharmacy staff described as unusual. Some examples of these prescriptions are set forth in the chart below:

14

| Patient | Rx # | Prescriber | Date Filled | Drug | Quantity | Payment |
|---------|------|-----------|-------------|------|----------|---------|
| S.R. | 2547973 | S. Mehta | 9/18/2013 | Oxycodone 30mg | 120 | Medicaid |
| S.R. | 2547974 | S. Mehta | 9/18/2013 | Oxycodone 30mg | 60 | Private Pay |
| R.B. | 2582391 | D. Webb | 1/15/2014 | Oxycodone 30mg | 120 | Medicaid |
| R.B. | 2582392 | D. Webb | 1/15/2014 | Oxycodone 30mg | 48 | Private Pay |
| V.P. | 2585536 | S. Mehta | 1/27/2014 | Oxycodone 30mg | 120 | Medicaid |
| V.P. | 2585537 | S. Mehta | 1/27/2014 | Oxycodone 30mg | 30 | Private Pay |
| D.P. | 2596808 | D. Webb | 3/4/2014 | OxyContin 80mg | 252 | Insurance |
| D.P. | 2596839 | D. Webb | 3/4/2014 | Oxycodone 30mg | 196 | Private Pay |
| L.B. | 2606332 | S. Mehta | 4/1/2014 | Oxycodone 15mg | 180 | Insurance |
| L.B. | 2606333 | S. Mehta | 4/1/2014 | OxyContin 15mg | 60 | Private Pay |
| M.B. | 2633345 | S. Mehta | 6/25/2014 | Hydromorphone 4mg | 120 | Insurance |
| M.B. | 2633346 | S. Mehta | 6/25/2014 | Hydromorphone 4mg | 60 | Private Pay |
| T.M. | 2665335 | S. Mehta | 10/02/2014 | Oxycodone 15mg | 120 | Medicaid |
| T.M. | 2665337 | S. Mehta | 10/02/2014 | Oxycodone 15mg | 30 | Private Pay |
| J.H. | 2704403 | D. Webb | 1/28/2015 | OxyContin 80mg | 168 | Private Pay |
| J.H. | 2704404 | D. Webb | 1/28/2015 | Oxycodone 30mg | 120 | Medicaid |
| J.H. | 2704405 | D. Webb | 1/28/2015 | Oxycodone 30mg | 272 | Private Pay |
| C.W. | 2732438 | D. Webb | 4/30/2015 | Oxycodone 30mg | 48 | Private Pay |
| C.W. | 2732439 | D. Webb | 4/30/2015 | Oxycodone 30mg | 120 | Medicaid |
| H.S. | 2790211 | D. Webb | 11/24/2015 | Oxycodone 30mg | 120 | Medicaid |
| H.S. | 2790212 | D. Webb | 11/24/2015 | Oxycodone 30mg | 48 | Medicaid |

31.     Further review of the WVBOP data identified several prescriptions with quantities

in line with those Family Discount Pharmacy staff identified as high. For example, the data show multiple instances of filling prescriptions from Dr. Deleno Webb for oxycodone 30mg pills in quantities of 294, 392, and 448 for 28-day supplies (10.5, 14, and 16 pills per day, respectively). A prescription for 16 oxycodone 30mg pills per day has a morphine milligram equivalency (MME) of 672. MME is a measure used to calculate the total daily dose of opioids prescribed to a patient. The Centers for Disease Control (CDC) advises medical providers to use extra precautions when increasing dosages to greater than 50 MME per day, and to carefully justify dosages greater than 90 MME per day.  According to the CDC, the risk of overdose is increased by at least two times for individuals ingesting dosages above 50 MME per day compared to those ingesting less than 20 MME per day. Furthermore, the CDC guidance notes that higher dosages of opioids have not been shown to reduce pain over the long term.

32.    Despite the concerns noted by Family Discount Pharmacy staff and Claycomb's admissions, WVBOP records show that Family Discount Pharmacy continued, even after the November 18, 2013 AIW, to dispense controlled substances based on prescriptions written by the doctors they expressed concerns about exhibiting suspicious or questionable prescribing practices. From November 19, 2013 to December 8, 2016, WVBOP records show that Family Discount Pharmacy filled approximately 161,792 dosage units of Schedule II and III controlled substances for Dr. Delano Webb.

33.    On June 12, 2018, a federal grand jury returned a second superseding indictment charging the following Hope Clinic physicians with conspiracy to distribute oxycodone and other charges related to illegal drug distribution: James Blume, Michael Moran, Sanjay Mehta[2], Brian

_____

[2] Dr. Mehta also had his license suspended by the West Virginia Board of Osteopathic Medicine

Gullett, Vernon Stanley, Mark Clarkson, William Earley, Paul Burke, and Roswell Lowry. The timeframe for the illegal drug distribution charges in the indictment is from November 2010 through June 11, 2015. The Hope Clinic and some of its physicians were identified during interviews with the Family Discount Pharmacy staff as having issued prescriptions that were suspicious. WVBOP records show that after the AIW was executed at Family Discount Pharmacy, the staff continued to fill prescriptions issued by the Hope Clinic physicians: from November 19, 2013 to March 13, 2015, WVBOP records show that Family Discount Pharmacy filled over 57,000 dosage units of Schedule II controlled substances for Dr. Mehta; from November 19, 2013 to June 2, 2014, WVBOP records show that Family Discount Pharmacy filled over 8,000 dosage units of Schedule II controlled substances for Dr. Stanley; from November 19, 2013 to March 19, 2015, WVBOP records show that Family Discount Pharmacy filled over 5,000 dosage unites of Schedule II controlled substances for Dr. Clarkson.

34.     WVBOP records also show that Family Discount Pharmacy filled prescriptions issued by Dr. John Pellegrini from November 2011 through November 2012.  Dr. Pellegrini also practiced at Hope Clinic and has pled guilty to a federal information charging him with conspiracy to commit money laundering in connection with proceeds of drug distribution. A search of the West Virginia Board of Osteopathic Medicine website also shows that on November 28, 2012, the West Virginia Board of Osteopathic Medicine issued an Order for Summary Suspension of License relating to Dr. Pellegrini. On October 21, 2016, the Board permanently revoked Dr. Pellegrini's license.

---

in July 2016 when the Board found him to be an immediate danger to the public. The Board of Osteopathic Medicine cited his role in the deaths of five people as a basis for its decision.

35.    Furthermore, analysis of WVBOP records also show that Family Discount Pharmacy filled prescriptions for these and several other practitioners who have either had actions against their medical licenses or who have been the subject of criminal prosecution for conduct related to their prescribing practices:

    a.    A search of the West Virginia Medical Board website provided the following information pertaining to Dr. Deleno H. Webb: On December 05, 2016, Dr. Webb executed a consent order in which he permanently surrendered his license to practice medicine and surgery in West Virginia.  In the same consent order he stipulated to a number of facts, including that, with respect to patient files reviewed by the Medical Board, he "commonly treated the patients with excessive dosages of opiates and benzodiazepines."  He likewise agreed that he had ignored inappropriate urine drug screens.  The consent order noted that an insurance provider and another physician had filed separate complaints with the Medical Board in 2014.  Dr. Webb stipulated that probable cause existed to substantiate various charges against him, including that he had prescribed controlled substances outside the course of professional practice and/or in amounts he knew or had reason to know were excessive.  WVBOP records show that Family Discount Pharmacy filled over 4,500 controlled substance prescriptions from January 2008 through December 2016 from Dr. Webb.

    b.    A search of the West Virginia Medical Board website provided the following information pertaining to Dr. Shivkumar Lakshminarayan Iyer: On May 13, 2002, Dr. Iyer's medical license was suspended for a two-year period and then placed on probation.  In February 2015, the Board issued an emergency suspension of Dr. Iyer's license.  After a hearing, the Board found that Dr. Iyer had prescribed controlled substances other than in good faith and in a therapeutic manner in accordance with accepted medical standards and in the course of his professional practice, and that Dr. Iyer had repeatedly prescribed controlled substances to patients in excessive amounts or with the intent or knowledge that a controlled substance would likely be used other than medicinally.  The Board issued a final order revoking Dr. Iyer's license in January 2016.  WVBOP records show that Family Discount Pharmacy filled approximately 2,600 controlled substance prescriptions from Dr. Iyer from March 2010 through October 2014.

    c.    A search of the West Virginia Medical Board website provided the following information pertaining to Dr. Vernon Stanley: In October 2013, the Board received an investigative report from Kentucky's Cabinet for Health and Family Services that identified areas of concern regarding prescribing oxycodone combinations with few prescriptions for less potent narcotics, the age of patients, the distance patients travelled to see Dr. Stanley, and the use of multiple pharmacies to fill his prescriptions.  The Board initiated a complaint and investigation regarding Dr.

Stanley.  On March 8, 2015, the Board initiated a second complaint based on a report from WVBOP Database Review Committee.  On July 11, 2016, the Board entered into a Consent Order in which Dr. Stanley stipulated to medical recordkeeping failures, but denied other charges against him.  WVBOP records show that Family Discount Pharmacy filled over 438 controlled substance prescriptions from September 2012 through June 2014, from Dr. Stanley.

d.  A search of the West Virginia Medical Board website provided the following information pertaining to Dr. Ulysses Diaz Agas:  In August 2005, Dr. Agas entered into a Consent Order pertaining to false representation regarding compliance with the continuing medical education requirement for licensure renewal.  WVBOP records show that Family Discount Pharmacy filled over 11,000 controlled substance prescriptions from January 2010 through January 2014, from Dr. Agas.

36.    Statistics publicly available on the U.S. Census Bureau website indicate that the 2010 Census found the population of Mt. Gay, West Virginia to be approximately 1,780 people and the entire population of Logan County, West Virginia, was approximately 36,000.  DEA records show that there are currently fourteen (14) registered retail or chain pharmacies located in Logan County.

37.    DEA obtained information from the Automated Reporting Consolidated Ordering System (ARCOS), a system the DEA maintains for tracking distribution of controlled substances to pharmacies, for Family Discount Pharmacy, and for a Rite-Aid pharmacy also located in Mt. Gay, approximately .2 miles away from Family Discount Pharmacy. The data shows that between 2012 and 2016, the Rite-Aid pharmacy ordered 70,100 dosage units of oxycodone product while Family Discount Pharmacy ordered 1,142,900 dosage units of oxycodone product.  In the same period, the Rite-Aid pharmacy ordered 814,700 dosage units of hydrocodone product while Family Discount Pharmacy ordered 4,132,020 dosage units of hydrocodone product.  I am not aware of any legitimate basis for such significant discrepancies between the quantities of oxycodone and hydrocodone dispensed by Family Discount Pharmacy and the Rite-Aid pharmacy located in close proximity in Mt. Gay, West Virginia.

19

38.    In April 2018, I reviewed more recent WVBOP records related to Family Discount

Pharmacy's current dispensing.  The data indicates that Family Discount Pharmacy continues to

fill large numbers of controlled substance prescriptions which are "red flags" for diversion.

Including the following:

a.    Dr. Susan Cavendar, M.D., was prescribing large quantities of Schedule II
controlled substances and some of the prescriptions were filled at Family Discount
Pharmacy.  WVBOP data showed that one of Cavendar's patients (hereinafter,
"M.C.") was prescribed so many opioids that his average daily MME was 827. As
noted above, the CDC strongly cautions against an MME of higher than 90.  From
December 2016 through at least April 2018, M.C. received prescriptions for 336
tablets of 30 MG oxycodone from Cavendar that were filled at Family Discount
Pharmacy consistently on a bi-weekly basis.

b.    Dr. Tanya Fancy, M.D., prescribed to a patient (hereinafter, "J.C.") 473 tablets of
7.5 mg hydrocodone in October 2016.  That prescription was written as an eight-
day supply.  The MME for this particular dispensation was 443 MME per day.
Family Discount Pharmacy dispensed the prescription on the same day it was
written.

c.    Dr. Safique Ahmed, M.D., prescribed to a patient (hereinafter, "M.C.") 100 tablets
of oxycodone in June 2018.  That prescription was written as an eight-day supply.
Family Discount Pharmacy dispensed the prescription on the same day it was
written.  Further review of WVBOP records pertaining to Ahmed's patient, M.C.,
revealed that M.C. was prescribed on a regular basis eight-day supplies of 100
tablets of Oxycodone, every eight days from December 2017 through June 2018.
Based on WVBOP information, M.C. paid for the medication with a mixture of
insurance and private pay.

39.    An overall review of WVBOP records revealed that from 2017 to 2018, patients

appeared to be travelling to other states to obtain controlled substance prescriptions, for Schedule

II narcotics such as hydrocodone and oxycodone, and then travelling to Family Discount Pharmacy

to have them dispensed.  Many of the patients are from the Logan, West Virginia, and surrounding

areas. Additional prescriptions demonstrated the following red flags for diversion:  high daily

MME, high numbers of pain medication within a short prescribing period, prescribing similar drug

combinations to individuals who appear to live in the same household, patients who live out of

state, and prescriptions filled from physicians who are out of state.   Multiple prescriptions dispensed by Family Discount Pharmacy were dispensed under DEA registrations that were either no longer in use or retired due to the practitioner not renewing their DEA registration, or obtaining a new registration when moving to a new state.

## COMPUTER EVIDENCE

40.     This application seeks permission to seize not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the premises described in Attachment A because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.   Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  Forensic evidence on a computer or storage medium can also indicate who has used

or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mails, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the date associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs or other forms of forensic evidence on a storage medium is necessary to draw accurate conclusions. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

41.     In most cases, a thorough search of a premise for information that might be stored on storage medium often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

    a. As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site.  Analyzing evidence of how a computer has been used, what it has been used for, and who used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises.  However, taking the storage media

23

off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Records sought under this warrant could be stored in a variety of storage media formats that require off-site reviewing with specialized forensic tools.

42.     Based on the foregoing, and consistent with Federal Rule of Criminal Procedure 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in Attachment B, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

43.     Family Discount Pharmacy is a functioning pharmacy.  The seizure of the office computers may limit the pharmacy's ability to conduct whatever business it continues to conduct. As with any search warrant, I expect that this warrant will be executed reasonably.  Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied.  Where appropriate and if feasible, efforts will be made to copy data rather than physically seize computers to reduce the extent of disruption.  If employees of the office so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the office's business.  If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, it will be promptly returned.

44.     The search team will include members of the DEA or other law enforcement

agencies who are specifically trained in the seizure of electronic evidence in whatever form. Depending upon the software Family Discount Pharmacy uses and its configurations and complexity, and as articulated above, agents may make a mirror copy of the entire hard drive or drives in order to maintain the integrity of the information and data. However, agents will in good faith review and seize only that which is the subject of this warrant, that is, items described in Attachment B.

## CONCLUSION

45.     I submit that the information contained in this Affidavit establishes probable cause to believe that Earl Claycomb and the other employees of Family Discount Pharmacy have ignored their corresponding responsibility to ensure the validity of the prescriptions they fill, and have engaged in illegal distribution of Schedule II narcotics which were dispensed pursuant to prescriptions issued not for legitimate medical purposes in the usual course of a professional medical practice and beyond the bounds of medical practice in violation of 21 U.S.C. §§ 841(a)(1), 843, and 846. There is probable cause to believe that evidence of such illegal drug distribution will be present at the premises known as Family Discount Pharmacy and more fully described in Attachment A. As noted herein, West Virginia law requires pharmacists to maintain records of prescriptions filled for at least five years. Moreover, DEA found prescriptions and records kept on-site at Family Discount Pharmacy in 2013, which is consistent with standard pharmacy practice. Therefore, I respectfully request the issuance of a search warrant authorizing law enforcement to search the premises described in Attachment A and seize the items listed in Attachment B.

Further your affiant sayeth naught.

Respectfully submitted,

Joshua T. Tripp
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on July 16th 2018:

HONORABLE DWANE L. TINSLEY
UNITED STATES MAGISTRATE JUDGE